UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 6:13-CR-32-GFVT-HAI-2 |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION AND |
| DUSTIN CHAD LAWSON, | ) | ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On referral from District Judge Van Tatenhove (D.E. 255 at 2), the Court considers reported violations of supervised release conditions by Defendant Dustin Lawson.

**FACTUAL AND PROCEDURAL BACKGROUND**

Judge Van Tatenhove entered a Judgment against Defendant on April 18, 2014, for one count of conspiracy to distribute oxycodone, in violation of 21 U.S.C. § 846.  D.E. 174 at 1. Defendant was sentenced to forty months of imprisonment followed by three years of supervised release.  *Id.* at 2-3.  Defendant began his initial term of supervised release on November 30, 2015.

On May 5, 2016, the United States Probation Office ("USPO") submitted a Supervised Release Violation Report and subsequently submitted an Addendum.  D.E. 238 at 1.  The Supervised Release Violation Report and Addendum alleged that Defendant failed to report to the probation officer as directed on various occasions, left the judicial district without permission, and failed to notify the probation officer at least ten days prior to any change in residence or employment.  *Id.* at 4.  Each of these were Grade C violations.  *Id.*  At the initial appearance, Defendant competently entered a knowing, voluntary, and intelligent stipulation to

all three violations.  *Id*. at 4-5.  The parties jointly requested that the undersigned release Defendant subject to the condition that he enroll in and complete a thirty-day inpatient substance abuse treatment program.  *Id.* at 5.  The undersigned adopted the parties' request and released Defendant.  *Id*.  After he completed the inpatient substance abuse treatment program, Defendant appeared before the undersigned for an allocution hearing.  *Id*.  The undersigned recommended that the District Judge adopt the parties' joint recommendation that Defendant remain on supervised release for the original period, and under the conditions previously imposed, with the added condition that he be required to disclose the nature and circumstances of his conviction in this Court and his drug abuse history to any physician prescribing a controlled substance to him. *Id*. at 7-8.  The District Judge accepted that recommendation on July 26, 2016.  D.E. 240, 241.

On January 25, 2018, the USPO issued the Supervised Release Violation Report ("the Report") that initiated these proceedings.  The Report alleges that Defendant reported to the USPO on January 12, 2018, and submitted a urine sample.  Defendant told his probation officer, Officer Joseph Tyler, that he took a methadone tablet, pursuant to a methadone maintenance treatment program, on that same day.  Defendant also had a valid prescription for oxycodone, which was written on November 5, 2017, for eight tablets.  He informed Officer Tyler that, on January 9, he took the last one-half of an oxycodone tablet from that prescription.  He denied use of any other controlled substances.  Defendant's urine sample was sent to Alere Toxicology Services and ultimately tested positive for norfentanyl, the metabolite of fentanyl.  The urinalysis report from Alere Toxicology Services indicated that the "Confirmation Method" was "GC/MS and/or LC-MS/MS."

The Report charges three violations stemming from this conduct.  First, as Violation #1, the Report charges that Defendant violated Standard Condition #7, which prohibits him from

purchasing, possessing, using, distributing, or administering any controlled substance, except as prescribed by a physician. This is a Grade C violation. Second, as Violation #2, the Report charges that Defendant violated the prohibition against committing another federal, state, or local crime based on his criminal history and the possession of fentanyl, which is a violation of 21 U.S.C. § 844(a), and a Class E felony. This is a Grade B violation. Third, as Violation #3, the Report charges that Defendant violated Standard Condition #3, which requires him to answer truthfully all inquiries by the probation officer.

Under 18 U.S.C. § 3583(e)(3), a defendant's maximum penalty for a supervised release violation hinges on the gravity of the underlying offense of conviction. 18 U.S.C. § 3583(e)(3). Defendant was convicted of conspiracy to distribute oxycodone, a Class C felony. *See* 21 U.S.C. § 841(b)(1)(C); 18 U.S.C. § 3559(a)(3). Defendant's conviction carries a two-year maximum period of incarceration upon revocation. 18 U.S.C. § 3583(e)(3). There is no maximum term of supervised release that may be re-imposed. 18 U.S.C. § 3583(h); 21 U.S.C. § 841(b)(1)(C).

The Policy Statements in Chapter 7 of the Sentencing Guidelines provide advisory imprisonment ranges for revocation premised on criminal history (at the time of original sentencing) and the "grade" of the particular violation proven. *See United States v. Perez-Arellano*, 212 F. App'x 436, 438-39 (6th Cir. 2007) ("Although the policy statements found in Chapter Seven of the United States Sentencing Guidelines recommend ranges of imprisonment, U.S.S.G. § 7B1.4, such statements are 'merely advisory' and need only be considered by the district court before sentence is imposed.") (citation omitted). Under Section 7B1.1, Defendant's admitted conduct would qualify as Grade C violations with respect to Violations #1 and #3, and a Grade B violation with respect to Violation #2. Given Defendant's criminal history category of V (the category at the time of the conviction in this District) and a Grade B violation, his range,

under the Revocation Table of Chapter 7, is eighteen to twenty-four months.  U.S.S.G. § 7B1.4(a).

On February 6, 2018, this Court conducted an initial appearance pursuant to Rule 32.1 and set a final hearing following a knowing, voluntary, and intelligent waiver of the right to a preliminary hearing.  D.E. 259.  At the initial appearance, the United States made an oral motion for interim detention and Defendant argued for release.  *Id*.  Based on the heavy 18 U.S.C. § 3143(a) defense burden, the Court found detention was required and remanded Defendant to the custody of the United States Marshal.  *Id*.

At the final hearing on March 5, 2018, Defendant was afforded all rights due under Rule 32.1 and § 3583.  D.E. 263.  Defendant contested the violations and the undersigned conducted an evidentiary hearing.  *Id*.  Following the presentation of the evidence, the Court continued the hearing to research an evidentiary issue.  *Id*.  The hearing was reconvened four days later, the Court heard argument and announced its findings, and Defendant was released subject to his current supervised release conditions.  D.E. 267.

## EVIDENCE

The government presented one witness, Officer Tyler, whose testimony can be broken down into two separate components – knowledge he had due to supervising Defendant and statements he relayed from a non-testifying witness.  First, he testified as follows:

> Q. Officer Tyler, how are you employed?
> A. United States Probation.
> Q. And how long have you been employed in that capacity?
> A. The 15th of this month will be seven years.
> Q. And were you the supervising officer for the defendant, Mr. Dustin Chad Lawson?
> A. I am.
> Q. And were you the supervising officer in January of this year?
> A. Yes, sir.

4

Q. And did you prepare the violation report that's the subject of this hearing?

A. Yes, sir.

Q. And in it, you allege that there's a violation of three separate conditions?

A. Yes, sir.

Q. Okay. If you would, can you explain to the Court how that came about or what led to -- to that violation report being submitted?

A. Yes, sir. Mr. Lawson was called into the office to – so I could collect a urine specimen. The urine specimen was sent off to the lab, eventually returned positive for norfentanyl. We charged him with use of the norfentanyl, the use equals possession, which would be violation number two, and then the being dishonest, not answering truthfully when asked about use of controlled substances.

Q. Let me ask you, did he admit when he came in to take the urinalysis to having used any controlled substances?

A. He did. He did.

Q. What did he say he had taken?

A. Oxycodone and methadone.

Q. And was there any mention of that -- at that time of him using any other controlled substances?

A. No, sir

Q. And what about those two substances, the methadone and the oxycodone, did the urinalysis screen show up positive for those?

A. No. Methadone is a special test, which we do not require. I know Mr. Lawson had a valid prescription or was going to a methadone clinic, so there was no need for that. The oxycodone did show negative.

Q. Okay.

A. He said he took half a tablet on the 9th. But it came back from the lab as negative.

Q. Okay. And again, no mention of any other substances at that time?

A. Controlled substances, no.

D.E. 265 at 4-6.  Importantly, the United States **did not** introduce the drug test report from the testing laboratory or any chain-of-custody documentation into evidence.

Officer Tyler then described a conversation he had with laboratory personnel:

Q. And have you had any conversations with lab personnel at Alere concerning the positive test results?

A. I have.

Q. And what was the nature of those discussions?

5

A. I called, spoke with Pat Pisso, the director of toxicology at Alere, inquiring about if there were any substances that could cause a false positive. She mentioned that there was a substance, Risperdal, which is used for antipsychotic – it's an antipsychotic medication. There are a number of opiates that could cause positive at the initial screening, however, she said there is nothing that could cause a false positive whenever GCMS is performed, the gas chromatography-mass spectrometry.

Q. And was that performed in connection with Alere's testing of this urine sample?

A. Yes, sir.

Q. And what was the result of that gas chromatography-mass spectrometry test?

A. It showed that he was positive for norfentanyl, which is a metabolite of fentanyl.

Q. Okay. And again, according to lab personnel, they're not aware of any substance that would cause a false positive utilizing that specific type of testing?

A. Correct.

*Id*. at 6-7. The quotations above constitute the entirety of Officer Tyler's testimony on direct examination.

The defense's evidence was meant to show that the positive test for norfentanyl was a false positive based on three factors – (1) documents indicating the medication trazodone can trigger a positive test for norfentanyl, (2) evidence that Defendant was prescribed trazodone, and (3) Defendant's testimony that he only had taken what was prescribed to him and had never taken fentanyl. Trazodone is not a controlled substance. *Id*. at 16. The first factor was supported by two exhibits introduced into evidence. Defense Exhibit 1 is a document entitled "Ordering and Interpreting Urine Drug Tests," appears to be a portion of a document entitled "UMHS Guidelines for Clinical Care May 2009," and purports to be copyrighted by the Regents of the University of Michigan. *Id*. at 12. The defense characterized this as a "study from 2009 in Michigan." *Id*. at 11. It states that a false positive for fentanyl can come "from trazodone" via gas chromatography/mass spectrometry testing. *Id*. at 13. Defense Exhibit 2 was discovered on

"quizlet.com" by defense counsel through a Google search and states "What antidepressant may cause a false positive Fentanyl screen" followed by "Trazodone." *Id*. at 14-15.

Officer Tyler acknowledged on cross-examination that he was aware Defendant had a prescription for trazodone, but did not discuss with Defendant whether he was taking that prescription around the time of the testing that resulted in the norfentanyl positive. *Id*. at 15. Instead, Officer Tyler requested that fentanyl be included in the testing of Defendant's sample because he had been to a conference during which a member of a DEA task force described "seeing" counterfeit tablets that appear to be oxycodone but actually contain fentanyl. *Id*. at 17.

Additionally, on cross-examination, Officer Tyler confirmed that the testing could not be relied upon to suggest that Defendant had lied about using oxycodone, meaning use/possession of fentanyl is the focus of the charged violations. *Id*. at 9. He stated that, although Defendant said he had used oxycodone, the negative test for that controlled substance was not inconsistent with Defendant's statement because he reported taking it three days prior. *Id*. He described Ms. Pisso as the director of toxicology at Alere Toxicology Services, and stated that he had spoken to her about 30 minutes before the hearing. *Id*. at 10. He further said that he had done a Google search for fentanyl false positives, and that the indication that trazodone could cause a false positive would surprise him because he did not find that in his research. *Id*. at 11-15.

On re-direct, the United States introduced into evidence Defendant's prescription history from Baptist Health indicating a prescription for 30 trazodone tablets issued on October 19, 2017, and described as a "30-day supply." *Id*. at 20-22. Further, Officer Tyler was questioned about being notified that Defendant, while detained pending the final hearing in this case, and several of his cellmates had tested positive for Suboxone, but that no records were kept of that testing by jail personnel and a test administered by Officer Tyler several days later was negative.

*Id.* at 23, 25. He also described various difficulties in supervising Defendant and characterized him as "hard to keep up with[.]" *Id.* at 24.

The Court had some questions about Officer Tyler's testimony concerning Ms. Pisso's statements. He first testified that "she said there is nothing that could cause a false positive whenever GCMS is performed" (D.E. 265 at 6) but later answered "correct" to the questions "according to lab personnel, they're not aware of any substance that would cause a false positive utilizing that specific type of testing?" (*id.* at 7) and that "Ms. Pisso said she was not aware of anything that may test positive on the gas chromatograph for fentanyl?" *Id.* at 11. When questioned by the Court, Officer Tyler stated that he mentioned trazodone to Ms. Pisso, but she had stated nothing would cause a false positive for fentanyl through GC/MS testing. *Id.* at 27.

Defendant then testified. The Court first assured he did so after being advised of his right to remain silent, having consulted with counsel about the consequences of waiving that right, and ensuring that he understood the consequences of testifying. *Id.* at 29-32. He described the circumstances of the testing at issue, confirmed that Officer Tyler only asked him about controlled substance use (which would not include trazodone), and denied having taken any controlled substances other than oxycodone and methadone (which were prescribed to him). *Id.* at 33-35. He was surprised by the positive fentanyl result, but turned himself in after hearing a US Marshal had been to his home. *Id.* at 35-36. The trazodone was prescribed to him to help him sleep and he took it as needed, including "within a few days of meeting with Mr. Tyler." *Id.* at 36-37. He declared "I've never taken fentanyl" and that he was truthful with Officer Tyler when he told him he had not used anything other than methadone and oxycodone. *Id.* at 38, 45. As for Suboxone use, he stated a jail officer said he tested clean and that the testing done by the jail "was just – it was chaos." *Id.* at 39-40. On cross-examination, Defendant acknowledged

being placed in the SHU after the Suboxone testing and that he was a long-term drug addict, but denied having obtained or taken an oxycodone that was not prescribed to him that might have contained fentanyl. *Id*. at 41-43.

The description above concerns the material evidentiary issues presented. The Court has considered the entirety of the evidence in formulating its recommendation herein.

## ANALYSIS

The Court is confronted with two close questions. First, can it rely upon the hearsay statements from Ms. Pisso? Second, when all the properly admitted evidence is considered, has the United States proven, by a preponderance of the evidence, that the violations occurred? Although close, the answer to both questions is no.

### *Whether to consider Ms. Pisso's opinion*

After the presentation of the evidence, the Court raised the question of whether Ms. Pisso's statements, as relayed by Officer Tyler, could be relied upon by the Court. Recognizing Sixth Circuit case law holds that, at a final supervised release violation hearing, the Defendant's need for confrontation should be outweighed by the government's cause for not calling a witness before out-of-court statements can be considered, the Court recessed the hearing to study that law. D.E. 263. The hearing was reconvened four days later to allow counsel to argue that threshold question, as well as to address the remaining issues in the matter. D.E. 266.

The procedures for final supervised release violation hearings are flexible and lack the formality of trial, including that neither the Rules of Evidence nor the Confrontation Clause apply. *United States v. Kirby*, 418 F.3d 621, 627 (6th Cir. 2005); *United States v. Waters*, 158 F.3d 933, 940 (6th Cir. 1998). But, of course, there are minimum due process protections afforded to persons facing the loss of their liberty. *Id*. Federal Rule of Criminal Procedure

32.1(b)(2)(C) entitles Defendant to "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C). The Sixth Circuit has held that the Court "may consider reliable out-of-court statements in a final revocation hearing provided that the defendant's need for confrontation is outweighed by the government's ground for not requiring confrontation." *Waters*, 158 F.3d at 940.[1] Obviously this analysis requires a balancing of these competing interests.

In an unpublished opinion, the Sixth Circuit has approved of "guidance" provided by the Ninth Circuit in conducting this balancing test. *United States v. Torrez*, 132 F.3d 34, 1997 WL 745520, *2 (6th Cir. 1997) (unpublished table opinion) (citing *United States v. Martin*, 984 F.2d 308, 311-12 (9th Cir. 1993)). Specifically, the Court

> may consider: (1) the importance of the evidence to the court's finding, (2) the defendant's opportunity to refute the evidence, (3) the consequences of the court's findings, (4) the difficulty and expense of procuring witnesses, and (5) the traditional indicia of reliability borne by the evidence.

*Id*. The Sixth Circuit further recognized that "the majority of the Circuits uphold the trial judge's determinations where the hearsay evidence is reliable, regardless of the court's correct application of the other considerations." *Id*. (citing *United States v. Walker*, 117 F.3d 417, 420 (9th Cir. 1997) and *United States v. Frazier*, 26 F.3d 110 (11th Cir. 1994)).

The underlying Ninth Circuit opinion in *Martin* provides useful context for evaluating these factors. That court described the test as a "right-cause balance," rejected the proposition that the considerations are "static," and described the approach as recognizing that "good cause

---

[1] The Sixth Circuit has held that *Crawford v. Washington*, 541 U.S. 36 (2004) "does not apply to revocation of supervised release hearings." *United States v. Kirby*, 418 F.3d 621, 627 (6th Cir. 2005). *Crawford* is not, in any way, the basis of the Court's ruling herein. Instead, as recognized by the Sixth Circuit in *Kirby*, hearsay can be considered, but must be reliable. *Kirby*, 418 F.3d at 628. In other words, the Court analyzes the admissibility of Ms. Pisso's opinion as a function of Defendant's entitlement to "minimal due process requirements, including the right to confront and cross examine adverse witnesses." *United States v. Torrez*, 132 F.3d 34, 1997 WL 745520, *2 (6th Cir. 1997).

[to overcome confrontation] in one set of circumstances may be insufficient in another." *Martin*, 984 F.2d at 310-11.

The first factor, the importance of the evidence to the Court's finding, flows from the need to rely on "verified facts" and recognizes that "[t]he more significant particular evidence is to a finding, the more important it is that the releasee be given an opportunity to demonstrate that the proffered evidence does not reflect 'verified fact.'" *Id.* at 311 (citing *Morrissey v. Brewer*, 408 U.S. 471, 484 (1972)). Because of the nature of the defense developed at the hearing, that Defendant ingested trazodone which can cause a false positive for fentanyl via GC/MS testing, Ms. Pisso's statements that nothing can cause such a false positive would be highly probative and perhaps dispositive. She was described as the Director of Toxicology at the testing laboratory, and her expert opinion on such a technical and scientific question would be "uniquely important" as the United States offered no other evidence to address the defense. *Id.* Thus, this factor signifies a "very strong interest" in favor of requiring Ms. Pisso to be subjected to cross-examination. *Id.*

The second factor, the defendant's opportunity to refute the evidence, certainly favors Defendant. The "nearly complete denial of *any* confrontation . . . weighs heavily" in the balancing test. *Id.* There was no opportunity to cross examine Ms. Pisso, instead Officer Tyler's testimony merely (ostensibly) regurgitated her opinion in a summary form. The parties and the Court certainly respect Officer Tyler's knowledge and expertise, but also recognize that neither encompasses the complicated matters implicated by Ms. Pisso's purported opinion. Indeed, Officer Tyler offered different versions of her statements, first stating that "she said there is nothing that could cause a false positive whenever GCMS is performed" (D.E. 265 at 6) but later answering "correct" to the questions "according to lab personnel, they're not aware of any

substance that would cause a false positive utilizing that specific type of testing?" (*id*. at 7) and that "Ms. Pisso said she was not aware of anything that may test positive on the gas chromatograph for fentanyl?"  *Id*. at 11.  In the former version, Ms. Pisso rendered an unequivocal opinion.  In the latter two versions she merely disclaimed knowledge of false-positive possibilities.  Such fertile ground to examine her on a very technical and specialized matter strengthens this factor in Defendant's favor.

But there is more.  Importantly, the actual written lab test report was not introduced into evidence by the United States.  Nor has it been filed anywhere in the record of this case.[2]  The parties and the Court had access to the written lab analysis prior to the final hearing, but it was never subjected to any evidentiary analysis at the hearing.  That analysis would have heightened the need to cross examine Ms. Pisso.  Her hearsay opinion is that GC/MS testing precludes false positives as an absolute matter.  *Id*. at 6.  But, the written drug test report states, with emphasis added, that the confirmation method was "GC/MS **and/or LC-MS/MS**."  Obvious questions abound given this reference.  What is LC-MS/MS testing?  Was it used in analyzing Defendant's urine?  If so, why?  If not, why not?  How does it differ from GC/MS testing?  Was GC/MS testing even actually used?  Can LC-MS/MS testing reveal a false positive for fentanyl if trazodone is present?  The list could go on and on.   Depriving Defendant of his liberty based on Ms. Pisso's unequivocal opinion about GC/MS testing when the Court is actually aware of facts suggesting another type of confirmation testing may have been used is simply not appropriate.

The third factor, the consequences of the Court's findings, also strongly favors Defendant's right of confrontation.  Defendant is charged with violating the condition that he not commit a federal, state, or local crime while on supervised release.  In the supervised release

---

[2] To ensure a complete decisional record in the event of an appeal, the Court will Order the Clerk to file the Report in the record.

context, the Sixth Circuit treats controlled substance use as equivalent to possession.  See *United States v. Crace*, 207 F.3d 833, 836 (6th Cir. 2000).  So, a finding that Defendant used fentanyl would necessarily include a finding of possession of fentanyl.  Possession of fentanyl, given Defendant's criminal history that includes a prior conviction for a drug offense, would constitute a felony violation of 21 U.S.C. § 844(a).  In turn, possession of a controlled substance would trigger mandatory revocation and imprisonment pursuant to 18 U.S.C. § 3583(g)(1).  Defendant faces a maximum revocation imprisonment term of twenty-four months, and an advisory Guidelines Range of 18 to 24 months.  *See* 18 U.S.C. § 3583(e)(3), 3559(a)(3); 21 U.S.C. § 841(b)(1)(C).  Accepting Ms. Pisso's hearsay opinion would essentially require revocation and a lengthy term of imprisonment.  As in *Martin*, Ms. Pisso's hearsay opinion would be "singularly important" to a finding of guilt and imprisonment would follow.  *Martin*, 984 F.2d at 312.  This is, of course, the most serious consequence that Defendant faces.

The fourth factor, the difficulty and expense of procuring Ms. Pisso, has, in this Court's view, no weight.  At the hearing, no explanation whatsoever was offered by the United States to explain why she was not presented as a witness.  And counsel clearly knew the importance of her hearsay testimony as it was elicited on direct examination.  It is true that contested final supervised release violation hearings are rare when laboratory analysis indicates a positive for drug use.  But, in this case, Defendant had clearly denied use of any non-prescribed narcotic when the urine sample was collected.  Officer Tyler prepared for the hearing by consulting with Ms. Pisso, even going so far as to question her about a false positive due to trazadone use.   D.E. 265 at 27.  And, counsel for the United States discussed these issues with Officer Tyler before the hearing started.  *Id*. at 10.  Thus, counsel for the United States was aware of the potential need for Ms. Pisso's opinion to be presented to the Court, but announced readiness for the

hearing  (*id*. at 3) and never offered any cause to explain her absence.  Finally, the Court would
certainly have entertained a request for a continuance to allow Ms. Pisso to testify either in-
person or by videoconference.  Because the need for her testimony was known and options were
available to secure her testimony, but none were pursued, this factor has no weight.  See *Martin*,
984 F.2d at 313 ("Because the government eschewed even these alternatives [to live testimony],
the expense or difficulty of procuring witnesses carries no weight in our consideration of good
cause.").

The final factor, the traditional indicia of reliability borne by the evidence, does favor the
United States somewhat, but not enough to outweigh Defendant's interest in cross-examining
Ms. Pisso.  Many of the cases addressing this reliability factor concern the admission of
urinalysis reports.  Indeed, in *Martin*, the Ninth Circuit observed "[t]hree other circuits have
previously upheld the admission of urinalysis reports in revocation hearings on the basis of their
indicia of reliability."  *Martin*, 984 F.3d at 313.  In that case, the Court rejected the proposition
that "urinalysis reports are so inherently reliable that they may be introduced in any revocation
hearing."  *Id*.  Such a "blanket rule" would render the balancing test irrelevant in such a context
and defy the flexibility imbedded in final revocation hearings.  *Id*. at 313-14.   But, because such
reports "are the regular reports of a company whose business it is to conduct such tests, and
which expects its clients to act on the basis of its reports," the court afforded "a certain amount
of weight to the test results' indicia of reliability."  *Id*. at 314.

Ms. Pisso's opinion is different than a written lab test result and is inherently less
credible.  Officer Tyler indicated she is the Director of Toxicology at the testing laboratory.  D.E.
265 at 6.  The Court assumes that she is a suitable expert to render the reported opinion, and
therefore is similarly-situated to a written drug test report in that she would regularly render such

14

opinions in the course of her work.  But, the opinion itself is a summary conclusion lacking in any independent indicia of reliability.  No basis or reason for her opinion was offered.  No supporting testing, analyses, studies, or other basis of knowledge was offered.  The opinion itself, on this record, is subject to interpretation.  Officer Tyler first relayed the opinion in an absolute form – that no false positive is possible when GC/MS testing is used.  D.E. 265 at 6.  But, he later testified that Ms. Pisso stated she was not aware of any substance that would cause a false positive for fentanyl.  *Id*. at 7, 11.  The Court attempted to clarify this discrepancy (*id*. at 27), but the fact that Officer Tyler gave inconsistent versions of Ms. Pisso's statements obviously undercuts their inherent reliability.

Consideration of the all the *Martin* factors makes clear that the government's cause for not presenting Ms. Pisso as a witness does not sufficiently outweigh Defendant's substantial right of confrontation.  The government attempted to rely upon an expert opinion on the most critical question the Court must answer, whether Defendant used fentanyl or his positive drug test was a function of having ingested trazodone, but the presentation of that opinion precluded any cross examination by the defense.  Were the Court to find cause outweighs the right of confrontation, Ms. Pisso's opinion would essentially mandate revocation and imprisonment in this case.  She may be a reliable expert, but true evaluation of her opinion requires examination, and especially cross-examination, of its foundation and applicability to the actual testing conducted in this case.  Denying that right to Defendant imperils his liberty to far too great an extent to comport with the minimum due process protections afforded by case law and Rule 32.1(b)(2)(C).

This result comports with the case law.  In *Waters*, two types of evidence were analyzed under the Rule.  Waters was charged with violating his supervised release by traveling outside

the district with a known felon to sell marijuana. *Waters*, 158 F.3d at 935. The government used hotel records and the written statement of a co-conspirator as evidence against him. *Id*. at 935-36. The Sixth Circuit held the hotel records were properly considered even without the testimony of a records custodian because the records contained notations that they were true copies of hotel records kept in the ordinary course of business that are generally considered reliable under the business records exception to the hearsay rule, and the information a custodian would testify to was apparent on the face of the records. *Id*. at 940-41 (citing Fed. R. Evid. 803(6)). Ms. Pisso's hearsay opinion lacks such readily apparent reliability. The Sixth Circuit also held that reliance upon the co-conspirator's statement was permissible. But, "key portions of [that] statement were corroborated by other evidence" including telephone records, hotel records, and even recorded telephone calls, and the co-conspirator was a fugitive and was unable to testify. *Id*. at 941-42. Ms. Pisso's opinion is not corroborated by anything else in the record, and she certainly was available to testify, the United States simply chose not to call her. *Waters* therefore stands as a good example of the need to show firm reliability before hearsay can be considered under Rule 32.1(b)(2)(C).

Next, in *Torrez*, the Sixth Circuit held that the district court had properly considered hearsay statements "of undercover agents, and an informant that had been used and proven reliable on several other occasions." *Torrez*, 1997 WL 745520 at *3. Their testimony was considered reliable because it was consistent with undisputed facts concerning the defendant's presence in his home where an informant said he would be for a drug purchase as well as evidence that the defendant's car was observed making other drug deliveries. *Id*. Such independent factual corroboration does not support Ms. Pisso's hearsay, expert opinion.

The present case is closer to *Martin*, in which the Ninth Circuit held that the testimony of a drug counselor who collected urine samples from the defendant and testified about the results of testing of those samples was improperly relied upon. The counselor testified to the "results" of the testing even though it was conducted by a separate laboratory, and the "government presented no other witnesses." *Martin*, 984 F.2d at 309. The counselor was unable to answer questions on cross-examination concerning the particular tests employed or the lab's general testing or handling procedures. *Id*. Much of the court's analysis in *Martin* is relied upon above and need not be repeated, but Ms. Pisso's summary and inconsistent hearsay opinion is, in this Court's view, more critical and less facially reliable that were the written test results at issue in *Martin*.

Three cases relied upon by the United States are readily and persuasively distinguishable. In *United States v. Porchia*, 180 F. App'x 596 (8th Cir. 2006), the court held, in a one-page *per curiam* opinion, that reliance upon a probation officer's testimony about positive sweat patch testing was permissible "[g]ive the reliability of drug-test evidence[.]" *Id*. No detail concerning the evidence actually offered is provided in the opinion. Here, of course, the actual drug test report was not offered into evidence. Moreover, the hearsay issue in the present case is reliance upon Ms. Pisso's opinion, which does not carry with it the same reliability as written drug test results, particularly because Officer Tyler expressed what Ms. Pisso had said in multiple ways. Next, in *United States v. McCormick*, 54 F.3d 214 (5th Cir. 1995), a urinalysis report was admitted but was supported by an affidavit of the lab's director "describing in detail [the] general testing procedures and the results of the particular analyses conducted on [the defendant's] specimen, specifically refuting [the] allegation that a positive result could be produced by taking another medication." *McCormick*, 54 F.3d at 223. Additionally, the defense had no evidence to

support the false-positive theory. *Id.* In *United States v. Grandlund*, 71 F.3d 507 (5th Cir. 1995), the court held that a probation officer's testimony about certain urinalysis results was properly considered by the district court, but described it as a "close case" even though the evidence concerned fifteen urine samples taken over time, with seven positive results, and unchallenged testimony that the defendant had not denied cocaine use on one occasion. *Grandlund*, 71 F.3d at 511. The court reasoned that "a confrontation with laboratory personnel would have been of little use to [the defendant]." *Id.* In contrast, denying confrontation in the present case would leave a highly specialized and sweeping opinion entirely untested.[3]

The Court reiterates that this evidentiary issue was entirely avoidable. The United States was aware that Defendant intended to offer evidence that use of trazadone could generate a false positive and that Defendant would be testifying. D.E. 265 at 22. Defense counsel represented to the Court that the basis of the defense was disclosed just prior to the hearing. Officer Tyler mentioned the specific defense to Ms. Pisso before the hearing, and counsel for the United States questioned Officer Tyler about Ms. Pisso's response on direct examination. This was not an unanticipated defense. Yet no specific "cause," much less good cause, was ever offered as to why she could not personally appear, or even offer testimony by affidavit or videoconference. Either were alternatives worth pursuing given the flexible nature of supervised release violation hearings, and, as counsel are aware, the Court is generally willing to grant continuances to foster full development of the record. The United States did argue that general concepts and burden of calling a technician to support any drug test report establish cause, but that is not the issue raised by Ms. Pisso's hearsay opinion. She reportedly made statements about the critical issue in the

---

[3] Other cases in which hearsay evidence was properly relied upon demonstrate that corroboration or witness unavailability, neither of which exist in the case before the Court, were the critical factors. In *United States v. v. Kokoski*, 435 F. App'x 472 (6th Cir. 2011), reliability was found in medical records generated in the ordinary course of business that corroborated each other and a probation officer's report that was corroborated by undisputed facts. In *United States v. Jessie*, 656 F. App'x 97, (6th Cir. 2016), the hearsay concerned the statements of a domestic violence victim who could not be served with a subpoena despite multiple attempts.

case – whether, if Defendant ingested trazodone as he testified, that could yield a false positive for fentanyl. She went far beyond the urinalysis reports generated regularly by the laboratory in its ordinary course of business. In these unique circumstances, denying Defendant the right to cross examine her does not comport with due process.

### Whether the Government Proved the Violations

By statute, supervised release violations must be proven by the government by a preponderance of the evidence. *See* 18 U.S.C. § 3583(e)(3). Because the Court will not rely upon the hearsay opinion from Ms. Pisso, the question is whether the remaining evidence preponderates in favor of a finding of guilt. It does not, primarily due to various weaknesses in the governments' proof and the counterweight of Defendant's testimony.

Violation #1 is premised upon the condition that "[t]he defendant . . . shall not purchase, possess, use, distribute, or administer any controlled substance . . . except as prescribed by a physician." D.E. 174 at 3, Standard Condition 7. Under *Crace*, a finding of use of fentanyl (without a prescription), would support a finding of possession of fentanyl in violation of both 21 U.S.C. § 844(a) and the standard condition that Defendant not commit another federal crime, meaning guilt as to Violation #2. *Id*.; *Crace*, 207 F.3d at 836. Finally, if the Court finds Defendant used fentanyl without a prescription, Violation #3 would be established as well because the record would support a finding that Defendant was not truthful with Officer Tyler when asked about controlled substance use in violation of Standard Condition #3. Thus, the critical question is whether the government proved Defendant used fentanyl without a prescription.

Officer Tyler's testimony was very conclusory. He stated he prepared a report that charges three violations based on a positive drug test, but, again, the written lab analysis was not

admitted into evidence. He did not specify when or how (meaning observed or not) the urine specimen was obtained. He stated it was "sent off to the lab, eventually returned positive for norfentanyl." D.E. 265 at 5.[4] The lab that conducted the test was not identified other than through questioning concerning Ms. Pisso. Officer Tyler offered no detail describing the chain of custody, nor was any chain-of-custody documentation admitted into evidence. Whether the sample was properly preserved or subject to tampering is therefore unknown. No evidence was offered concerning the lab's chain-of-custody procedures, what the lab's standard testing procedures are, or whether they were followed in this case. Importantly, without Ms. Pisso's statements, no evidence was offered on direct examination concerning even the type of testing that was performed at the lab. Thus, the government's evidence boils down to a verbal declaration that Defendant's urine tested positive for a metabolite of fentanyl, but without any supporting explanation or corroborative detail. For many reasons, the reliability and accuracy of the test are essentially open questions.

Of course, Defendant testified. He denied having taken any controlled substances other than oxycodone and methadone (which were prescribed to him). D.E. 265 at 33-35. He was surprised by the positive fentanyl result, but turned himself in after hearing a US Marshal had been to his home. *Id*. at 35-36. He declared "I've never taken fentanyl" and that he was truthful with Officer Tyler when he told him he had not used anything other than methadone and Oxycodone. *Id*. at 38, 45. The government argues Defendant is not credible because he is a long-term drug addict and is highly motivated to avoid revocation. The Court agrees with those assessments as a basic matter, but they are not sufficiently weighty in this case to discount all of Defendant's testimony. Indeed, the government's evidence confirms that Defendant had a

---

[4] At the reconvened hearing, the defense clarified that it does not contest that the report was positive for norfentanyl. However, that concession does not mean that consideration of issues like the chain-of-custody, testing standards, or testing methodology is not relevant.

prescription for trazodone, and he testified that he took it as needed, including "within a few days of meeting with Mr. Tyler." *Id*. at 36-37. The Court agrees with the United States that Defendant's Exhibits 1 and 2, because they lack any indicia of reliability such as authorship, attribution, or evidentiary foundation, do not carry much weight in establishing that trazodone can cause a false positive for fentanyl. But this does not mean that Defendant's testimony lacks credibility. He testified that he did not have any reason to believe that trazodone would cause a false positive before defense counsel researched the issue and brought it to his attention. *Id*. at 38. The Court does not believe that, even though it is given low weight, the possibility of a false positive based on the defense's theory and counsel's investigation coincided by mere chance with Defendant's undisputed prescription for trazodone. As a result, the Court does not believe that Defendant's testimony can be entirely discounted. Therefore, Defendant's testimony that he did not use fentanyl is entitled to some weight. Plus, after reviewing Defense Exhibits 1 and 2, Officer Tyler testified as follows:

> Q. So other than the test itself, you have no indication of use by Mr. Lawson?
> A. Of fentanyl, no, sir.
> Q. Correct. Given what I have provided you, these documents from Michigan and from the world of Google, access for us all, there is a possibility that it's a false positive even on the gas chromatograph, correct?
> A. The Quizlet, I'm not so sure about. I don't know the -- who conducted the testing. From what it appears on here, if this is legitimate to be from the University of Michigan, you know, in 2009, from what they say, I guess -- from what they say, it could test positive.
> Q. Okay.
> A. So –
> Q. Well, and that's what we're relying on here --
> A. Right.
> Q. -- is what they say. Because we don't have Ms. Pisso hereto testify so we're relying on what she told you earlier today.
> A. Right.
> Q. And I provided you this document. So we're relying on what they say as well, correct?

> A. Correct.
> Q. So with that being the case, you have a positive test, but you
> don't have any other evidence of use and you have this
> information. It's also likely that it can be a false positive, correct?
> A. It could be a number of possibilities.
> Q. Right. And amongst all those possibilities, only one of those is
> the actual use of it, of that substance, correct?
> A. Correct.
> Q. Okay.

*Id*. at 18-19. Thus, Officer Tyler acknowledged that the defense's theory raised some doubt concerning the testing.

In sum, the government's evidence is conclusory and, in this Court's view, weak for the reasons described above. The method of testing was not even established by the government outside of Ms. Pisso's hearsay statements. Defendant testified, and though there are general reasons to question his credibility, none of his testimony was persuasively demonstrated to be untruthful. Thus, the evidence is essentially evenly balanced and the Court therefore finds that the United States has not established, by a preponderance of the evidence, that Defendant used fentanyl without a prescription.

## CONCLUSION

Based on the foregoing, the Court **RECOMMENDS** that Defendant be found not guilty of Violations #1-#3. Additionally, the Clerk is **ORDERED** to file the written Drug Test Report provided herewith in the record of this case.

Defendant's right of allocution under Rule 32.1 is preserved, as reflected in the record. Any waiver should comport with the Court's standard waiver form, available from the Clerk. Absent waiver, the matter will be placed on Judge Van Tatenhove's docket upon submission.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. *See also* 18 U.S.C. § 3401(i). As

defined by § 636(b)(1), within fourteen days after being served with a copy of this recommended disposition, any party may serve and file written objections to any or all portions for consideration, *de novo*, by the District Court. Failure to make timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

       This the 21st day of March, 2018.

**Signed By:**

**_Hanly A. Ingram_**

**United States Magistrate Judge**